JUDGE FRANK MONTALVO

FILED

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

2023 JAN 20  AM 10: 58

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
                    DEPUTY

|   |   |
|---|---|
| **BRANDON CALLIER,** | § |
| | § |
| **Plaintiff,** | § |
| | § |
| **v.** | § |
| | § |
| **CREDIT MOUNT INC,** a New York | § |
| Corporation, and **DENNIS SHAKHNOVICH** aka | § |
| **DENNIS TENSHOV** | § |
| | § |
| **Defendant.** | § |

**EP 23 CV 0030**

## PLAINTIFF'S ORIGINAL COMPLAINT

### PARTIES

1.      Plaintiff BRANDON CALLIER ("Plaintiff") is a natural person, resident of the Western

District of Texas, and was present in Texas for all calls, in this case in El Paso County, Texas.

2.      Defendant CREDIT MOUNT INC ("Credit Mount") is a New York Corporation

organized and existing under the laws of New York and can be served via registered agent Credit

and Business Consultant at 1790 Flatbush Ave, Brooklyn NY, 11210.

3.      Defendant DENNIS SHAKHNOVICH aka DENNIS TENSHOV ("Shakhnovich") is a

natural person, resident of Florida, chief executive officer of Defendant Credit Mount, and can

be served at 2122 SW 13th Avenue, Cape Coral, Florida 33991.

4.      Defendants Credit mount and Shakhnovich are hereinafter referred to collectively as

("Defendants").

### JURISDICTION AND VENUE

5.      **Jurisdiction.**  This Court has federal-question subject matter jurisdiction over Plaintiff's

TCPA claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012). This Court has supplemental subject matter jurisdiction over Plaintiff's claim arising under Texas Business and Commerce Code 302.101 because that claim arises from the same nucleus of operative fact, i.e., Defendants' telemarketing calls to Plaintiff; adds little complexity to the case.

6.      **Personal Jurisdiction.**  This Court has specific personal jurisdiction over the Defendants because they have repeatedly placed calls to Texas residents, and derive revenue from Texas residents, and they sell goods and services to Texas residents, including the Plaintiff.

7.      **Venue.**  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to the claims—the calls and sale of goods and services directed at Texas residents, including the Plaintiff—occurred in this District and because the Plaintiff resides in this District.  Residing in the Western District of Texas when he received a substantial if not every single call from the Defendants that are the subject matter of this lawsuit.

8.      This Court has venue over the Defendants because the calls at issue were sent by Defendants to the Plaintiff, a Texas resident

**THE TELEPHONE CONSUMER PROTECTION ACT**

**OF 1991, 47 U.S.C. § 227**

9.      In 1991, Congress enacted the TCPA to restrict the use of sophisticated telemarketing equipment that could target millions of consumers *en masse*.  Congress found that these calls were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally.  *See* S. Rep. No. 102-178, at 2-3 (1991), as reprinted in 1991 U.S.C.C.A.N. 1968, 1969-71.

10.     The TCPA makes it unlawful "to make any call (other than a call made for emergency

purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii).

11.    The TCPA makes it unlawful "to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order" of the Federal Communication Commission ("FCC"). 47 U.S.C. § 227(b)(1)(B).

12.    The TCPA provides a private cause of action to persons who receive calls in violation of § 227(b). 47 U.S.C. § 227(b)(3).

13.    Separately, the TCPA bans making telemarketing calls without a do-not-call policy available upon demand. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(d)(1).[1]

14.    The TCPA provides a private cause of action to persons who receive calls in violation of § 227(c) or a regulation promulgated thereunder. 47 U.S.C. § 227(c)(5).

15.    According to findings of the FCC, the agency vested by Congress with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls and can be costly and inconvenient.

16.    The FCC also recognizes that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

---

[1] *See* Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

17.     The FCC requires "prior express written consent" for all autodialed or prerecorded telemarketing robocalls to wireless numbers and residential lines.  In particular:[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer:  (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

18.     *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted). FCC regulations "generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

19.     The FCC confirmed this principle in 2013, when it explained that "a seller … may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

20.     Under the TCPA, a text message is a call. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 – 52 (9th Cir. 2009).

21.     A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *E.g.*, *Jackson Five Star Catering, Inc. v. Beason*, Case No. 10-10010, 2013 U.S. Dist. LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate

actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute." (internal quotation marks omitted)); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415 – 16 (D. Md. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

### The Texas Business and Commerce Code § 302.101

22.     The Texas Business and Commerce code requires sellers to obtain a registration certificate from the Secretary of State in order to make telephone solicitations inside the state of Texas or to residents located in the state of Texas.

23.     The Plaintiff may seek damages for violations of Texas Business and Commerce Code § 302.101 of up to $5,000 per violation, reasonable costs of prosecuting the action, court costs, investigation costs, depositions expenses, witness fees, and attorney's fees.

24.     Texas Business and Commerce Code § 302.101 provides a private right of action.  A violation of Chapter 302 "is a false, misleading, or deceptive act or practice under Subchapter E, Chapter 17" and is enforceable as such: "A public or private right or remedy prescribed by Subchapter E, Chapter 17, may be used to enforce [Chapter 302." Tex. Bus. & Com. Code § 302.303.

### FACTUAL ALLEGATIONS

25.     Plaintiff successfully registered his personal cell phone XXX-XXX-4604 on the Do-Not-Call Registry in December 2007 and was on the National Do-Not-Call Registry at all times relevant to this Complaint.

26.     Defendant Credit Mount offers credit restoration and debt elimination services to consumers nationwide including Texas where Plaintiff resides.

5

27.     Defendant Shakhnovich owns and controls Defendant Credit Mount.

28.     As part of their marketing, Defendant Shakhnovich hires and authorizes telemarketers to make unauthorized phone calls to thousands of consumers *en masse* to solicit Defendant Credit Mount's goods and services.

29.     Defendant Shakhnovich approves of the contracts with these telemarketers.

30.     Defendant Shakhnovich authorizes the payments to the telemarketers.

31.     Defendant Shakhnovich pays the telemarketers out of bank accounts he owns and controls.

32.     Defendants Credit Mount and Shakhnovich are well aware that the unauthorized phone calls being made on their behalf soliciting their "debt elimination" program violates the TCPA.

33.     Plaintiff received at least twenty-five (25) unauthorized calls from telemarketers calling on behalf of Defendants soliciting "debt elimination" services within a thirty-day period ("the calls").

34.     On December 30, 2022, Plaintiff received a call to his personal cell phone ending in 4604 from a telemarketer "Arocha Arturo "calling on behalf of Defendants.  The call came from a spoofed phone number (915) 383-6559.

35.     Arocha advised Plaintiff that call was regarding "debt elimination" services and asked if Plaintiff had any credit card debt.

36.     Plaintiff was annoyed and frustrated for receiving solicitation calls regarding debt elimination services and advised Arocha he had credit card debt for the sole purpose of identifying the company responsible for the calls.

37.     Plaintiff was then connected to another representative who identified himself as "Michael" "and advised Plaintiff he was his "financial adviser.

38.     Michael then confirmed Plaintiff's credit card debt and solicited Plaintiff for a "debt elimination" program on behalf of Defendants and stated:

> Whatever the balance is right now that you carry on your credit cards it will be forgiven.  It will be eliminated so you are not responsible to make any more payments on your credit cards from now on.  The debt that you have on your credit cards will be completely eliminated.

39.     Michael then advised Plaintiff:

> Debt elimination will be active for 30 days and will get closed and the entire balance will get eliminated completely. You will no longer be responsible for making payments on your current credit cards and they will be closed in 30 days. We do not believe in making money on you guys since you are trying to pay off your credit card bill. The fee will be charged on your credit card and will also get eliminated with the balance and both figures will be completely eliminated and live a debt-free life and your card in the amount of $5008.00 will get charged onto your credit card account which will also get eliminated once the payment is made. This is a 6 to 12-month program and they will wipe out the total credit card bill and your credit score will jump up to position after we eliminate balance.

40.     Michael then advised Plaintiff he now needed to be connected to a "Verification officer"

41.     Plaintiff was then connected to another representative who identified herself as "Stacy Adams" who said she was a "Verification Officer".

42.     Defendants train their telemarketers not to reveal their true identity for the sole purpose of ducking liability for violating the TCPA.

43.     Stacy advised Plaintiff they would be charging a fee of $5008.00 for the services and would send the "paperwork" through email or mail.

44.     Plaintiff repeatedly advised Stacy he needed paperwork before any charge is authorized on his credit card.

45.     Stacy then advised she would be connecting the call to another representative and will get her "Project manager" on the other line.

46.     Plaintiff was then connected to the "Project Manager" that identified herself as Robin

7

Meadows from the "qualification team."   Robin advised Plaintiff he had been approved for a

Sam's Club Mastercard and would be charging in the amount of $5008.00 to start the "debt

elimination" program.

47.     Plaintiff asked Robin if he was going to receive something in writing prior to

them charging his credit card and Robin stated, "I will have my assistant send you that

paperwork and will send it by mail or email."

48.     Plaintiff then received another phone call by a Michael Jordan advising the phone

call is a "preauthorization" that allows them to charge the fee of $5,008.00 is charged to

Plaintiff's credit card and advised he will call back with more info since he cannot send

any paperwork before credit card is charged.

49.     Plaintiff was frustrated that none of the representatives would send him

paperwork before attempting to charge his credit card more than $5,000.  Plaintiff then

told Michael, "If this is how you operate, do not call me again."

50.     Paragraph 49 was a firm Do-Not-Call Request.

51.     Despite Plaintiff's request for Defendant Credit Mount's telemarketers not to call

Plaintiff back, Michael called Plaintiff immediately after being told to not call again.  Michael

then transferred Plaintiff to a representative named Natalia from Defendant Credit Mount.

52.     Natalia advised Plaintiff she would email him the contract for the "debt elimination"

program.

53.     Plaintiff received an email from Natalia with the contract of the "debt elimination"

program from Defendant Credit Mount. *See Exhibit A.*

54.     The email Plaintiff received from Natalia confirmed the company responsible for the

calls.

55.     Defendants' telemarketers continued to knowingly and willfully call Plaintiff asking him to sign the contract after Plaintiff made it clear he was not interested and to stop calling him.

56.     Defendants have collectively facilitated, marketed, and enabled the "debt relief" service activities and the collection of payments in advance of services rendered in violation of the Telemarketing Sales Rules (TSR). 16 C.F.R. § 310.4(a)(5)(i).

57.     Number 11 of the contract Natalia sent to Plaintiff states, "The client agrees to pay and understands and agrees that the services will not be performed until the fee has been paid."

58.     Defendant's telemarketers made false and misleading promises to "eliminate" Plaintiff's credit card debt through a "Debt elimination" process.

59.     The Federal Trade Commission says "Debt relief" service scams target consumers with significant credit card debt by falsely promising to negotiate with their creditors to settle otherwise reduce consumers' repayment obligations.  These operations often charge cash-strapped consumers a large up-front fee, but then fail to help them settle or lower their debts – if they provide any service at all.  Some debt relief scams even trout their services using automated "robocalls" to consumers on the Do-Not-Call List."  Debt Relief and Cred https://www.ftc.gov/news-events/media-resources/consumer-finance/debt-relief-credit-repair-scamsit Repair Scams | Federal Trade Commission (ftc.gov)

60.     The Federal Trade Commission has filed numerous lawsuits in an attempt to combat the proliferation of "Debt Relief" companies committing fraud against American citizens. Numerous states have also begun passing laws to combat this fraud.

61.     Defendants collectively knowingly and willfully mislead Plaintiff with respect to the elimination of his credit card debts.

62.     Defendants violated the Tex. Bus. and Com. Code and committed a deceptive trade

practice when it promised to "eliminate" Plaintiff's debt and attempted to collect money upfront in advance of services rendered and earned.

63.     Defendants employs outrageous, aggressive, and illegal sales techniques that violate multiple federal laws and state consumer statutes and ethical practices for the solicitation of legal services.

64.     Defendants participated in, facilitated, directed, authorized, knew of, or willfully ignored the unlawful telemarketing calls, while knowing facts that required a reasonable person to investigate further, and approved, and ratified the conduct of their employees, agents, and co-conspirators to engage in the false and misleading sales practices and unlawful telemarketing calls.

65.     Plaintiff never gave his prior express written consent to receive the calls alleged herein.

66.     Mr. Callier has limited data storage capacity on his cellular telephone. Incoming telemarketing calls consumed part of this capacity.

67.     On information and belief, the Defendants did not train its telemarketers/agents who engaged in telemarketing on the existence and use of any do-not-call list.

68.     Plaintiff feigned interest in the Defendant' services on a number of occasions in order to receive the contract and confirm the company responsible for the harassing calls.

69.     Table A below displays the calls Plaintiff received on behalf of Defendants:

TABLE A:

| Number: | Date | Time | Caller ID | Notes |
|---------|------|------|-----------|-------|
| 1 | 12/30/2022 | 09:31 AM | 915-383-6559 | Call form telemarketer Arocha. Transferred to telemarketer Michael |
| 2 | 12/30/2022 | 11:55 AM | 915-383-1317 | Call from telemarketer Michael |
| 3 | 12/30/2022 | 11:56 AM | 915-383-0149 | Call from telemarketer Michael |
| 4 | 12/30/2022 | 11:57 AM | 915-383-9270 | Call from telemarketer Michael |
| 5 | 12/30/2022 | 12:21 PM | 915-383-9593 | Call from telemarketer Michael |

| 6 | 12/30/2022 | 12:48 PM | 915-383-4726 | Call from telemarketer Michael |
|---|---|---|---|---|
| 7 | 12/30/2022 | 1:24 PM | 407-606-4736 | Call from telemarketer Michael |
| 8 | 12/30/2022 | 1:44 PM | 321-460-3010 | Call from telemarketer Michael |
| 9 | 12/30/2022 | 1:50 PM | 520-487-6886 | Missed call from Credit Mount |
| 10 | 12/30/2022 | 1:51 PM | 520-487-6886 | Direct call from Credit Mount |
| 11 | 12/30/2022 | 1:53 PM | 520-487-6886 | Call from telemarketer Michael told him to stop calling me. |
| 12 | 12/30/2022 | 1:58 PM | 915-383-2383 | Call from telemarketer Michael. Transferred to Natalia from Credit Mount and she said would email contract. |
| 13 | 12/30/2022 | 2:14 PM | 718-285-9988 | Missed call from Natalia |
| 14 | 12/30/2022 | 2:26 PM | 520-487-6886 | Missed call from telemarketer Michael |
| 15 | 12/30/2022 | 2:51 PM | 718-285-9988 | Call from Natalia asking if I received contract she sent. |
| 16 | 12/30/2022 | 3:27 PM | 520-487-6886 | Missed call from telemarketer Michael |
| 17 | 12/30/2022 | 3:27 PM | 520-487-6886 | Call from telemarketer Michael telling me to sign contract. Told him to stop calling me |
| 18 | 01/02/2023 | 8:57 AM | 520-487-6886 | Call from telemarketer Michael |
| 19 | 01/09/2023 | 1:56 PM | 915-383-9179 | Call from male telemarketer |
| 20 | 01/09/2023 | 1:57 PM | 915-383-8450 | Call from male telemarketer |
| 21 | 01/09/2023 | 4:01 PM | 915-383-5919 | Call from male telemarketer |
| 22 | 01/10/2023 | 8:10 AM | 520-487-6886 | Call from male telemarketer |
| 23 | 01/10/2023 | 8:16 AM | 915-383-9342 | Call from male telemarketer |
| 24 | 01/11/2023 | 1:16 PM | 915-383-7256 | Call from male telemarketer |
| 25 | 01/11/2023 | 3:09 PM | 520-487-6886 | Call from male telemarketer |

70.    Defendants' telemarketers collectively knowingly and willfully mislead Plaintiff with respect to the forgiveness of his credit card debt.

71.    Defendants refuse to take any action to stop or curtail the unlawful sales practices and illegal telemarketing because these practices benefit Defendants financially.

72.    Defendants do not have a solicitation registration certificate on file with the Texas Secretary of State as required to make telephone solicitations to Texas residents.  Plaintiff is a Texas resident.

73.    The https://direct.sos.state.tx.us/telephone/telephonesearch.asp site ("Texas Registration

Database") does not contain any of the Defendants' registration.

74.     Defendants do not qualify for an exemption under § 302.052.

75.     These telephone solicitations constituted "calls" under the TCPA that were not made for emergency purposes.

76.     Defendants' telemarketers initiated numerous unsolicited telephone calls, made unlawful telemarketing sales pitches regarding "debt elimination" unlawfully collected payment upfront, and unlawfully collected Plaintiff's personal information, such as social security number, email address, address, credit card issuer, and home address.

77.     Defendants participated in, facilitated, directed, authorized, knew of, or willfully ignored the unlawful calling, while knowing facts that required a reasonable person to investigate further, and approved, and ratified the conduct of their telemarketers, agents, and co-conspirators to engage in the false and misleading sales practices and unlawful calling.

78.     The calls were placed without the maintenance of an internal do-not-call policy. The calls were placed without training their telemarketers/employees on the use of an internal do-not-call policy.

79.     On information and belief, the Defendants did not have a written do-not-call policy while their telemarketers were sending Mr. Callier the unsolicited calls.

80.     On information and belief, the Defendants did not train its telemarketers on the existence and use of any do-not-call list.

81.     Mr. Callier has limited data storage capacity on his cellular telephone. Incoming telemarketing calls consumed part of this capacity.

82.     No emergency necessitated the calls.

## THE SELLERS SHOULD BE HELD LIABLE TO UPHOLD THE
## DETERRENT EFFECT AND PURPOSE OF THE TCPA

83.     As the court ruled in Jackson v Caribbean Cruise Line, Inc., the defendant sellers should be held liable for their violations of the TCPA. Courts have looked at the purpose of the TCPA and found that not holding the sellers liable through vicarious liability would undermine the purpose of the TCPA.

84.     The Federal Trade Commission has filed numerous cases against companies such as the Defendant Credit Mount and for illegally charging upfront fees and falsely promising to lower or eliminate the consumers' credit card debt.

## <u>VICARIOUS LIABILITY OF DEFENDANTS</u>

85.     Defendants are vicariously liable for the telemarketing calls that generated the lead on their behalf.

86.     The FCC is tasked with promulgating rules and orders related to the enforcement of the TCPA. 47 U.S.C. § 227(b)(2).

87.     The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

88.     The FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 565 ¶ 10 (2008) (recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

89.     The FCC confirmed this principle in a declaratory ruling holding that sellers such as Post

may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its
> telemarketing activities to unsupervised third parties would leave
> consumers in many cases without an effective remedy for telemarketing
> intrusions. This would particularly be so if the telemarketers were
> judgment proof, unidentifiable, or located outside the United States, as is
> often the case. Even where third-party telemarketers are identifiable,
> solvent, and amenable to judgment limiting liability to the telemarketer
> that physically places the call would make enforcement in many cases
> substantially more expensive and less efficient, since consumers (or law
> enforcement agencies) would be required to sue each marketer separately
> in order to obtain effective relief. As the FTC noted, because sellers may
> have thousands of independent marketers, suing one or a few of them is
> unlikely to make a substantive difference for consumer privacy.

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnote omitted)

(alteration marks and internal quotation marks omitted).

90.     More specifically, *Dish* held that, even in the absence of evidence of a formal contractual

relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the

telemarketer "has apparent (if not actual) authority" to make the calls.  *Id.* at 6586 ¶ 34.

91.     The ruling rejected a narrow view of TCPA liability, including the assertion that a seller's

liability requires a finding of formal agency and immediate direction and control over the third-

party who placed the telemarketing call. *Id.* at 6587 ¶ 36 & n.107.

92.     To the contrary, the FCC—armed with extensive data about robocalls and Americans'

complaints about them—determined that vicarious liability is essential to serve the TCPA's

remedial purpose of protecting Americans from "unwanted telemarketing invasions." *Id.* at 6587

¶ 36.

93.     Vicarious liability is important because reputable, traceable, and solvent companies that benefit from illegal telemarketing are "in the best position to monitor and police TCPA compliance by third-party telemarketers." *Id.* at 6588 ¶ 37.

94.     Defendants are legally responsible for ensuring that the affiliates that make telemarketing calls on their behalf comply with the TCPA when so doing.

95.     Defendants knowingly and actively accepted business that originated through illegal telemarketing.

96.     Defendants knew (or reasonably should have known) that their telemarketers were violating the TCPA on their behalf but failed to take effective steps within their power to force the telemarketer to cease that conduct.

97.     By hiring a company to make calls on its behalf, Defendants "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency ("Restatement").

98.     Moreover, Defendants maintained interim control over the actions of their telemarketers.

99.     For example, Defendants had absolute control over whether, and under what circumstances, they would accept a customer from their telemarketers.

100.     Furthermore, Defendants had day-to-day control over the actions of its telemarketers, including the ability to prohibit them from contacting potential customers of Defendant Credit Mount and the ability to require them to respect the National Do Not Call Registry.

101.     Defendants also gave interim instructions to its telemarketers by providing lead-qualifying instructions and lead volume limits.

102.     Defendants donned its telemarketers with apparent authority to make the calls at issue. Thus, the telemarketers pitched Defendants "debt elimination" program in the abstract.

103.    Apparent authority turns on whether a third party believes the principal authorized its

agent to act and the belief is "traceable" to a manifestation of the principal. Restatement § 2.03

cmt. c.

104.    "[A]pparent authority can arise in multiple ways and does *not* require that 'a principal's

manifestation must be directed to a specific third party in a communication made directly to that

person.'" *Dish*, 28 FCC Rcd. at 6586 ¶ 34 n.102 (quoting Restatement § 2.03 cmt. c).

105.    A principal may make a manifestation "by directing an agent to make statements to third

parties or directing or designating an agent to perform acts or conduct negotiations, placing an

agent in a position within an organization, or placing an agent in charge of a transaction or

situation." Restatement § 2.03 cmt. c.

106.    Defendants' telemarketers transferred customer information, including Plaintiff's contact

information, directly to Defendant Credit Mount. Thus, the telemarketer had the "ability . . . to

enter consumer information into the seller's sales or customer systems," which the FCC has

explained to show apparent agency. *Dish*, 28 FCC Rcd. at 6592 ¶ 46.

107.    Finally, the FCC has held that called parties may obtain "evidence of these kinds of

relationships . . . through discovery, if they are not independently privy to such information." *Id.*

at 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the

telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a

reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's

authorized agent." *Id.* at 6593 ¶ 46.

108.    Defendants are the liable parties as the direct beneficiary of the illegal telemarketing calls

as they stood to gain Plaintiff as a customer when telemarketers solicited Plaintiff for their "debt

elimination" program on behalf of Defendants.

## DEFENDANT SHAKHNOVICH IS PERSONALLY LIABLE

109.   Defendant Shakhnovich refuses to take any action to stop or curtail the unlawful sales practices and illegal unauthorized phone calls because these practices benefit Defendant Shakhnovich financially.

110.   "If the officer directly participated in or authorized the statutory violation, even though acting on behalf of the corporation, he may be personally liable.  See *United States v Pollution Serv. Of Oswego, Inc.*, 763 F.2d 133, 134-135 (2nd Cir.1985)

111.   The "well-settled" tort rule provides that "when corporate officers directly participate in or authorized the commission of a wrongful act, even if the act is done on behalf of the corporation, they may be personally liable." *General Motos Acceptance Corp. v. Bates*, 954 F.2d 1081, 1085 (5th Cir. 1992).  The Fifth Circuit has elaborated that "the thrust of the general [tort] rule is that the officer to be held personally liable must have some direct, personal participation in the tort, as where the defendant was the 'guiding spirit' behind the wrongful conduct....or the 'central figure' in the challenged corporate activity." *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cirt. 1985) (Citing *Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F. 2d 902, 907 (1st Cir.1980)) (Citing *Texas v. American Blastfax, Inc.*, 164 F. Supp. 2d 892 (W.D. Tex. 2001)

112.   Quoting Texas v. American Blastfax:

> The Court finds the above principles applicable to the TCPA that is, an officer may be personally liable under the TCPA if he had direct, personal participation in or personally authorized the conduct found to have violated the statute, and was not merely tangentially involved.  Individuals who directly (and here, knowingly and willfully) violate the TCPA should not escape liability solely because they are corporate officers.  As the State persuasive argues, to hold otherwise would allow the individual defendants to simply dissolve Blastfax, set-up a new shell corporation, and repeat their conduct.  Congress surely did not intend to permit such a result in passing the TCPA.

17

To be clear, the Court finds Greg and Michael Horne were the "guiding spirits" an the "central figures" behind the TCPA violations. They were the two persons who controlled all of Blastfax's day-to-day operations. They both had direct, personal involvement in and ultimate control over every aspect of Blastfax's wrongful contuct that violate the TCPA, and/or directly controlled and authorized this conduct. And they did so with their eyes and pocketbooks wide open. After October 5, 2000, Greg and Michael Horne had good reason to believe they were running a business that violated the TCPA. On February 9, 2001, they knew they were. Yet they continued to direct their company to send unsolicited intrastate fax advertisements. This is fare more than a simple derivative liability case. Accordingly, the Court *899 holds defendants Greg and Michael Horne are jointly and severally liable with Defendant Blastfax, Inc., for all TCPA damages in this lawsuit." Texas v. American Blastfax, Inc., 164 F. Supp. 2d 892 (W.D. Tex. 2001)

113.    The Same Court held that corporate officers were also personally liable for DTPA violations

The State contends Greg and Michael Horne are personally liable for any DTPA damages because they were solely responsible for the violating conduct.....For the same reasons discussed in finding the individual defendants personally liable under the TCPA, the Court agrees. See, e.g., Barclay v. Johnson, 686 S.W.2d 334, 336-37 (Tex. Civ. App.-Houston [1ST Dist.] 1985, no writ) (finding personal liability for corporate officer in DTPA misrepresentation claim, based on general rule that "a corporate agent knowingly participating in a tortious of fraudulent act may be held individually liable, even though he performed the act as an agent for the corporation......Accordingly, the Court finds defendants American Blastfax, Inc., Greg Horne and Michael Horne are jointly and severally liable for $6,000 in damages for their violations of the DTPA." Texas v. American Blastfax, Inc., 164 F. Supp. 2d 892 (W.D. Tex. 2001

113.    At all times material to the Complaint, acting alone or in concert with others, Defendant Shakhnovich has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Defendant Credit Mount including the acts or practices set forth in this Complaint.

114.    Defendant Shakhnovich is the principal director and operator of Defendant Credit Mount controls the day-to-day operations of Defendant Credit Mount and directed their representatives,

employees, agents, salespersons, and telemarketers to make TCPA violating phone calls to solicit their "debt elimination" program on behalf of Defendants.

115.    Defendant Shakhnovich personally directed the telemarketing calls be made.

116.    Defendant Shakhnovich knowingly and willfully ignores the law. These violations are the direct result of the instructions Defendant Shakhnovich has given to their telemarketers, representatives, agents, employees, solicitors, salespersons, and others that carry out her schemes.

117.    Defendant Shakhnovich is not merely a bystander and is the mastermind who planned, directed, initiated, and controlled the illegal and fraudulent behavior.

118.    Defendant Shakhnovich is well aware this conduct violated the TCPA and Tex. DPTA and refused to alter the behavior.  Defendant Shakhnovich is the sole director of Defendant Credit Mount and the only person with the power make the unlawful, fraudulent, and unethical behavior stop.  Yet, Defendant Shakhnovich has taken no steps to stop the behavior because the behavior benefits Defendants financially.

119.    Defendant Shakhnovich and Defendant Credit Mount should be held jointly and severally liable for both the TCPA violations and the Texas DTPA because he actually committed the conduct that violated the TCPA and Texas DTPA, and/or he actively oversaw and directed this conduct.

120.    Defendant Shakhnovich should be held liable because to do otherwise would simply allow him to dissolve Defendant Credit Mount and set up a new corporation and repeat his conduct.  This would result in both the TCPA and DTPA being unenforceable.

### INJURY, HARM, DAMAGES, and ACTUAL DAMAGES
### AS A RESULT OF THE CALLS

121.    Defendants' calls harmed Plaintiff by causing the very harm that Congress sought to prevent—a "nuisance and invasion of privacy."

122.    Defendants' calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone.

123.    Defendants' calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone line.

124.    Defendants' calls harmed Plaintiff by intruding upon Plaintiff's seclusion.

125.    Plaintiff has been harmed, injured, and damaged by the calls including, but not limited to: reduced device storage, reduced data plan usage, anger, frustration, invasion of privacy, and more frequent charging of his cell phone.

### Plaintiff's cell phone is a residential number

126.    The calls were to Plaintiff's cellular phone ending in 4604 which is Plaintiff's personal cell phone that he uses for personal, family, and household use. Plaintiff maintains no landline phones at his residence and has not done so for at least 15 years and primarily relies on cellular phones to communicate with friends and family. Plaintiff also uses his cell phone for navigation purposes, sending and receiving emails, timing food when cooking, and sending and receiving text messages. Plaintiff further has his cell phone registered in his personal name, pays the cell phone from his personal accounts, and the phone is not primarily used for any business purpose.

### Violations of the Texas Business and Commerce Code 305.053

127.    The actions of the Defendants violated the Texas Business and Commerce Code 305.053 by placing unauthorized calls to a cell phone which violates 47 USC 227(b). The calls by the Defendants violated Texas law by placing unauthorized calls to a cell phone which violate 47 USC 227(c)(5) and 47 USC 227(d) and 47 USC 227(d)(3) and 47 USC 227(e).

128.    The calls by the Defendants violated Texas law by spoofing the caller ID's per 47 USC 227(e) which in turn violates the Texas statute.

### Violations of the Texas Business and Commerce Code § 302.101

129.    The actions of the Defendants violated the Texas Business and Commerce Code 302.101 by placing solicitation phone calls to a Texas resident without having a registration certificate and bond on file with the Texas Secretary of State.

130.    Under Texas Business and Commerce Code § 302.302 Plaintiff is entitled to seek damages of up to $5000 per violation of §302.101.

### FIRST CLAIM FOR RELIEF

### (Violation of TCPA "Sales Call/DNC" Prohibition, 47 U.S.C. 227(c) and 47 C.F.R. § 64.1200(c))

### (Against All Defendants)

131.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs. 1 through 130.

132.    Defendants called Plaintiff's private residential telephone number which was successfully registered on the National Do-Not-Call Registry more than thirty-one (31) days prior to the calls for the purposes of commercial solicitation, in violation of 47 U.S.C. § 227(c)(3)(F), and 47 C.F.R. § 64.1200(c)(2).

133.    Plaintiff was statutorily damaged at least twenty-five (25) times under 47 U.S.C. § 227(c)(3)(F) by Defendants by the telemarketing calls described above, in the amount of $500.00 per call.

134.    Plaintiff was further statutorily damaged because Defendants willfully and/ or knowingly violated this subsection of the TCPA. Plaintiff requests that the court treble the damage amount as permitted under 47 U.S.C. § 227(c)(5) for each and every willful and/or knowing violation.

135.    Plaintiff is entitled to an award up to $1,500 in damages for each knowing or willful violation of 47 U.S.C. § 227(c)(3)(F).

## SECOND CLAIM FOR RELIEF

### Violations of Texas Business and Commerce Code 305.053

### (Against All Defendants)

136.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs 1 through 130.

137.    The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of the Texas Business and Commerce Code 305.053, by making non-emergency telemarketing calls to Mr. Callier's cellular telephone numbers without his prior express written consent in violation of 47 USC 227 et seq.

138.    Plaintiff is entitled to an award of at least $500 in damages for each such violation. Texas Business and Commerce Code 305.053(b).

139.    Plaintiff is entitled to an award of up to $1,500 in damages for each such knowing or willful violation. Texas Business and Commerce Code 305.053(c).

## THIRD CLAIM FOR RELIEF

### Violations of Texas Business and Commerce Code 302.101

### (Against All Defendants)

140.    Plaintiff incorporates the foregoing allegations as if s.et forth herein. by reference each and every allegation set forth in the preceding paragraphs 1 through 130.

141.    The foregoing acts and omissions of Defendant and/or their affiliates or agents constitute multiple violations of the Texas Business and Commerce Code 302.101, by making non-registered solicitation calls to Plaintiff's cellular telephone number without his prior express written consent.

142.    Plaintiff is entitled to an award of up to $5,000 in damages for each such knowing or willful violation. Texas Business and Commerce Code 302.302(a).

143.    Plaintiff is entitled to an award of all reasonable costs of prosecuting the action, including court costs and investigation costs, deposition expenses, witness fees, and attorney's fees.  Texas Business and Commerce Code 302.302(d).

## I. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brandon Callier prays for judgment against the Defendants jointly and severally as follows:

A.      Leave to amend this Complaint to name additional DOES as they are identified and to conform to the evidence presented at trial;

B.      A declaration that actions complained of herein by Defendants violate the TCPA and Texas state law;

C.      An injunction enjoining Defendants and their affiliates and agents from engaging in the unlawful conduct set forth herein;

D.      An award of $1500 per call in statutory damages arising from the TCPA §227(c) intentional violations jointly and severally against the corporation and individual for 25 calls.

E.      An award of $1,500 in statutory damages arising from violations of the Texas Business and Commerce code 305.053 intentional violations jointly and severally against the corporation and individual for 25 calls.

F.      An award of $5,000 in statutory damages arising from violations of the Texas Business and Commerce code 302.101 intentional violations jointly and severally against the corporation and individual for 25 calls.

G.      An award to Mr. Callier of damages, as allowed by law under the TCPA;

H.      An award to Mr. Callier of interest, costs and attorneys' fees, as allowed by law and equity

I.      Such further relief as the Court deems necessary, just, and proper.

January 20, 2023,                              Respectfully submitted,

                                              Brandon Callier
                                              Plaintiff, Pro Se
                                              6336 Franklin Trail
                                              El Paso, TX 79912
                                              915-383-4604